*Karunaker Aleti, et ux. v. Metropolitan Baltimore, LLC, and Gables Residential Services, Inc.*, No. 39, September Term, 2021, Opinion by Booth, J.

**LANDLORD AND TENANT — LOCAL LICENSING ORDINANCE — FAILURE TO LICENSE RENTAL PROPERTY — PRIVATE RIGHT OF ACTION**

Article 13, § 5-4(a)(2) of the Baltimore City Code, which prohibits a landlord from charging, accepting, retaining, or seeking to collect rent for a rental property unless the property is properly licensed, does not provide tenants with a private right of action to collect a refund of rent and related fees already paid to a landlord who was unlicensed during the rental term but who otherwise complied fully with the lease agreement. Tenants may not recover rental payments and related fees paid to the landlord based solely on the landlord's lack of a license.

**LANDLORD AND TENANT — ACTION FOR MONEY HAD AND RECEIVED**

The common law cause of action for money had and received lies when a defendant has obtained possession of money that, in equity and good conscience, the defendant should not be allowed to retain. The Circuit Court for Baltimore City correctly dismissed the tenants' claim for money had and received to the extent that the tenants sought to recover rent based solely on the lack of licensure because the landlord had provided all that was bargained for under the lease, and there were no allegations that the property was deficient.

However, the circuit court erred in dismissing the claim for money had and received to the extent that the tenants sought restitution of any legal fees the landlord collected when it was unlicensed, where the tenants alleged that the landlord had brought unlawful actions for nonpayment of rent, made false representations as to its licensure status, and had collected and retained those legal fees.

Circuit Court for Baltimore City
Case No.: 24-C-20-001105
Argued: February 7, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 39

September Term, 2021

KARUNAKER ALETI, et ux.

v.

METROPOLITAN BALTIMORE, LLC, AND
GABLES RESIDENTIAL SERVICES, INC.

*Getty, C.J.,
*McDonald,
Watts,
Hotten,
Booth,
Biran,
Wilner, Alan M.
   (Senior Judge, Specially Assigned),

JJ.

Opinion by Booth, J.
Watts and Wilner, JJ., concur and dissent.

Filed: July 28, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to Maryland Constitution, Art. IV, Section 3A, they also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

In this case, we must determine whether the Baltimore City Council's enactment of a local law created a private right of action for Baltimore City tenants to recoup rent payments and related fees they paid in connection with their use and occupancy of rental dwellings during a period when a landlord did not have a valid rental license.

Prior to August 2018, the Baltimore City residential rental housing inspection and licensing laws only applied to multi-dwelling units. Inspections were performed by the City's inspectors. In 2018, Baltimore City adopted Bill 18-0185, which was enacted as Ordinance 18-130. The local law, among other things, amended the provisions of the Baltimore rental license and inspection law to expand its application to include non-owner occupied one- and two-family dwelling units, and required inspections to be performed by licensed third-party inspectors. As part of the amendments, the City Council amended the language contained in Article 13 § 5-4(a)(2)[1] of the Baltimore City Code to prohibit any person from charging, accepting, retaining, or seeking to collect rent for a rental dwelling unless the person was properly licensed at the time of both the offer to provide the dwelling and the occupancy.

The Petitioners, Karunaker and Chandana Aleti, were tenants in a 34-story multi-unit apartment building located at 10 Light Street. They filed a putative class action in the Circuit Court for Baltimore City against the Respondents, Metropolitan Baltimore, LLC, the owner of 10 Light Street, and Gables Rental Services, Inc., the property manager. For

---

[1] All references to the Baltimore City Code are references to Article 13. For simplicity's sake, we shall sometimes refer to the provisions of Article 13 only by their Section reference.

ease of reference, we will refer to both entities collectively as "Metropolitan." The Aletis alleged that for a period of approximately ten months while they were tenants of 10 Light Street, Metropolitan did not hold an active rental license for the property, as required by § 5-4(a) of the Baltimore City Code. The Aletis, unaware of the lack of licensure, paid rent, and other fees, such as water and utility charges, to Metropolitan, which they seek to recoup through this action. The Aletis do not assert that the lack of licensure caused them any harm or injury, or that their use and occupancy of the apartment unit was diminished in any way. Instead, they assert that §5-4(a)(2) establishes a private right of action whereby they may obtain a judicial remedy of restitution or disgorgement of all rent and fees that they paid during the unlicensed period.

The complaint contained four counts. In Count I, the Aletis requested a declaratory judgment that the leases entered into during the unlicensed period are "void and unenforceable" and that Metropolitan may not file court actions for failure to pay rent, or collect legal fees, rent or other compensation during the 302 days when it was unlicensed. In Count II, the Aletis sought money damages in the amount of all rent and other compensation paid to Metropolitan during the 302 days it was unlicensed, in violation of § 5-4(a). In Count III, the Aletis sought to recover the same amount plus a refund of the legal fees they paid as restitution damages based upon the common law cause of action for money had and received. In Count IV, the Aletis alleged a breach of contract based upon their lease, which they contend incorporated by reference the provisions of § 5-4(a).

In response to a motion to dismiss filed by Metropolitan, the circuit court dismissed the case prior to determination of any issues pertaining to class certification. In a reported

2

opinion, the Court of Special Appeals largely agreed with the circuit court. *Aleti v. Metropolitan Baltimore, LLC*, 251 Md. App. 482 (2021). The intermediate appellate court held that the Aletis: (1) did not have an implied private right of action under Article 13 § 5-4(a)(2) of the Baltimore City Code; (2) did not state a claim for breach of contract; (3) could not use the common law count of money had and received to recover rent paid during the unlicensed period, except to recover legal fees and other related fees that they paid to Metropolitan in connection with the failure to pay rent cases that Metropolitan filed when it was unlicensed; and (4) that they were entitled to a declaratory judgment.

We granted the Aletis' petition for writ of *certiorari* to consider three questions, which we have rephrased as follows:[2]

1) Does Article 13 § 5-4(a)(2) of the Baltimore City Code create an implied private right of action enabling tenants to obtain the judicial remedy of restitution or disgorgement of rent that was paid to the landlord during a period when the landlord was unlicensed?

2) Is the common law action of money had and received available to a tenant to permit the remedy of restitution or disgorgement of rent paid during the period when the landlord was unlicensed?

---

[2] The questions presented in the petition for writ of *certiorari* are:

1) Does Article 13, § 5-4(a)(2) of the Baltimore City Code create an implied private right of action to recover a return of rent that a landlord was prohibited from collecting or retaining?

2) Is the money had and received cause of action available to a tenant to recover a return of rent that a landlord was prohibited from collecting or retaining by operation of § 5-4(a)(2)?

3) Is the breach of contract cause of action available to a tenant when a landlord agrees to abide by § 5-4(a)(2) and not accept, collect, or retain rent if the property is not licensed, but then collects, accepts, and retains rent in violation of § 5-4(a)(2)?

3) Did the Aletis' complaint state a claim for breach of contract where the complaint merely alleges that the landlord did not have a license and accepted rent in violation of § 5-4(a)?

For the reasons set forth more fully herein, we answer no to the above questions and affirm the judgment of the Court of Special Appeals in all respects.

Because all the counts in the Aletis' complaint are based upon the 2018 amendments to the Baltimore City Code, it is useful to provide some background on the Baltimore City rental license and inspection scheme before we get into the specific allegations that form the basis of the complaint.

# I

## Baltimore City Rental License and Inspection Laws

### A.    *Article 13 of the Baltimore City Code – Intent and Purposes*

Article 13 of the Baltimore City Code is "a comprehensive statutory scheme aimed at 'establish[ing] minimum standards governing the condition, use, operation, occupancy, and maintenance of dwellings . . . in order to make dwellings safe, sanitary, and fit for human habitation.'" *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 81 (2003) (alteration and omission in original) (quoting Baltimore City Code (2000), Art. 13 § 103(a)(2), *abrogated on other grounds by Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594 (2011)).  As the Court of Special Appeals noted, "Section 2-1, which states determinations and declarations of the Baltimore City Council supporting its adoption of Article 13 and establishment of the City's Department of Housing and Community Development, identifies a broad focus on the City and its residents generally." *Aleti*, 251 Md. App. at 491.  In relevant part, § 2-1 states:

(a)   *Determinations.*

It is hereby found and determined:

   (1) that there exist within the City of Baltimore slum, blighted, deteriorated, or deteriorating areas, which constitute a serious and growing menace, injurious and inimical to the public health, safety, morals and general welfare of the residents of the City of Baltimore;

   (2) that the existence of such areas and the growth and spread thereof and the deterioration or threatened deterioration of other areas:

      (i)   contribute substantially and increasingly to the spread of disease and crime, and to losses by fire and accident;

      (ii)   necessitate excessive and disproportionate expenditures of public funds for the preservation of the public health and safety, for crime prevention, correction, prosecution, and punishment, for the treatment of juvenile delinquency, for the maintenance of adequate police, fire, and accident protection, and for other public services and facilities;

      (iii)   constitute an economic and social liability;

      (iv)   substantially impair or arrest the sound growth of the community;

      (v)   retard the provision of decent, safe, and sanitary housing accommodations;

      (vi)   aggravate traffic problems . . . ;

      (vii)   depreciate assessable values;

      (viii) cause an abnormal exodus of families from the city; and

      (ix)   are detrimental to the health, the well-being and the dignity of many of the residents of the City of Baltimore;

   (3) that such areas cannot be dealt with effectively by the ordinary operations of private enterprise without the aids herein provided;

5

(4) that the rehabilitation or elimination, in whole or in part, of slum, blighted, deteriorated, and deteriorating areas . . . are public uses and purposes requiring the exercise of the governmental powers of the City of Baltimore in the public interest.

(b) *Declarations*.

(1) It is further found and declared that . . . areas not yet deteriorated or deteriorating, or portions thereof, may be conserved so that the conditions and evils hereinbefore enumerated may be prevented from spreading thereto or arising therein; and that all such areas within the boundaries of the City of Baltimore may be benefited through the enforcement of applicable regulatory codes relating to buildings, housing, sanitation or safety, the rendering of services to community organizations or through a combination of other means provided in this ordinance.

(2) It is further found and declared that the elimination, correction, and prevention of the conditions and evils hereinbefore enumerated must be undertaken through the use of a comprehensive and integrated program; that this program should involve whatever range of municipal powers and resources is required to enable the City of Baltimore to act affirmatively in fulfilling its responsibilities to its citizens; that this program requires a suitable administrative structure to undertake adequately a coordinated and purposeful attack on urban slums and blight and the prevention of new areas of slums and blight; and that a comprehensive program should be undertaken within the boundaries of the City of Baltimore.

(3) It is further found and declared that the powers conferred by this ordinance *{subtitle}* are for public uses and purposes for which public money may be expended and the power of eminent domain exercised and that the necessity in the public interest for the provisions herein enacted is hereby declared and determined.

As part of its "comprehensive and integrated program" to further the above stated intent and purposes, the City Council enacted a residential license and inspection scheme, which is currently set forth in Article 13, Subtitle 5. We turn to those specific provisions next.

6

### B. City's Rental License Law —Prior to the 2018 Amendment

The City's rental license law has been around for many decades. Prior to the adoption of the 2018 amendment, the applicable provisions of Article 13, Subtitle 5 only required those landlords who operated a multiple-family dwelling or rooming house to have a license. As a condition to obtaining a license or a renewal, the dwelling unit was required to be registered and pass an inspection. Before the 2018 amendment, City housing inspectors conducted the inspections necessary to obtain a rental license.

The term of registration was one year, although the City's Housing Commissioner had the authority to provide for staggered terms for a period of less than one year, or for a period of more than one year but less than two years. Then, as it does now, the City Code contained public enforcement provisions providing for the enforcement of Subtitle 5 through the issuance of an environmental citation as authorized by the City Code, "in addition to any other civil or criminal remedy for enforcement procedure[.]" § 5-20.[3] The Code provisions further provide that "[t]he issuance of an environmental citation to enforce this subtitle does not preclude pursuing any other civil or criminal remedy or enforcement action authorized by law." *Id.* The Code also states that any person who violates Subtitle 5 is guilty of a misdemeanor, and upon conviction, is liable for a fine of not more than $1,000 for each offense. § 5-24.[4] Each day that a violation continues is a separate offense. *Id.*

---

[3] With the 2018 amendment, the enforcement provisions were moved from § 5-20 to § 5-25.

[4] With the 2018 amendment, the penalty provisions were moved from § 5-24 to § 5-26.

7

## C. *The 2018 Amendment—Bill 18-0185*

In 2018, the Baltimore City Council adopted Bill 18-0185, which amended certain sections of Article 13, Subtitles 4 and 5. The expressly stated purpose of Bill 18-0185 was:

> FOR the purpose of adding certain non-owner occupied 1- and 2-family dwellings to the licensing, inspection, and related requirements for multi-family dwellings and rooming houses (collectively, "rental dwellings"); modifying the fees, procedures, and prerequisites for the registration of certain non-owner-occupied dwellings, rooming houses, and vacant structures; modifying the procedures and prerequisites for the licensing of rental dwellings; providing for the denial, suspension, or revocation of a rental dwelling license under certain circumstances; providing for judicial and appellate review of administrative decisions relating to the registration or the licensing of these structures[5]; amending the underlying definition of "rooming house" to clarify its applicability to a bed and breakfast facility; defining and redefining certain other terms; imposing certain penalties; correcting, clarifying, and conforming related language; providing certain transition rules for pre-existing licenses; providing for a special effective date; and generally relating to the registration of non-owner-occupied dwellings, rooming houses, and vacant structures and to the licensing of rental dwellings.

Consistent with the above-stated purpose, Bill 18-0185 effectuated two significant changes to the City's rental license laws. *First*, it expanded the City's rental license and inspection requirements to *all* non-owner-occupied dwellings rather than just multi-unit properties. *Second*, it required property owners to hire third-party licensed home inspectors (instead of City inspectors) to complete the rental inspections prior to receiving a rental

---

[5] Although the initial draft of the Bill and its stated purpose indicated that it would provide for "judicial and appellate review of administrative decisions relating to the registration or licensing" of rental dwellings, these proposed amendments were stricken from the Bill after introduction and prior to adoption at the recommendation of the City's Office of the Department of Law.

license, thereby shifting the administrative burden associated with those inspections from the City to the property owner.[6]

Section 5-4 was revised as part of the amendments that expanded the rental and inspection requirements to *all* non-owner-occupied dwelling units. Prior to the 2018 amendment, § 5-4 stated: "No person may: operate any multiple-family dwelling or rooming house without a license to do so from the Commissioner." Bill 18-0185 modified the language in § 5-4(a) to read as follows:

**§ 5-4. License Required.**

(a) *In general.*

Except as provided in subsection (b) of this section,[7] no person may:

(1) rent or offer to rent to another all or any part of any rental dwelling without a currently effective license to do so from the Housing Commissioner; or

(2) charge, accept, retain, or seek to collect any rental payment or other compensation for providing to another the occupancy of all or any part of any rental dwelling unless the person was licensed under this subtitle at both the time of offering to provide and the time of providing this occupancy.

---

[6] The 2018 amendment also made additional changes, such as implementing a tiered license expiration based upon the property owner's compliance with the local codes. However, the salient substantive changes related to the expansion of the license and inspection requirements to all non-owner-occupied dwellings and the privatization of the inspection process.

[7] Section 5-4(b) contains an exception to the license requirement for any rental dwelling that is owned and operated by the Housing Authority of Baltimore City. This exception does not apply to this case. Accordingly, we shall not discuss it further.

9

The Aletis contend that Bill 18-0185—and specifically, the above-quoted amendments to § 5-4(a)(2)—created a private right of action that enables Baltimore City tenants to seek a judicial remedy of restitution or disgorgement of rent paid during the period that the tenant occupied an unlicensed dwelling based upon the unit's lack of licensure alone. Against the backdrop of this statutory scheme, including the 2018 amendments, we turn to the specific allegations in the Aletis' complaint and the procedural history of this case before it reached our Court.

## II

### Factual Background and Procedural History

We adopt the succinct summary of the Aletis' allegations and procedural history that was provided by the Court of Special Appeals in *Aleti*, 251 Md. App. at 495–97, which we quote below.

> #### A. *The Lease*
>
> On May 31, 2019, the Aletis entered a lease agreement with Metropolitan to rent an apartment on the 16th floor of 10 Light Street for a one-month term beginning on June 1, 2019 and expiring on June 30, 2019, subject to automatic renewals on a monthly basis (the "Lease"). Pursuant to the Lease, the Aletis were obligated to pay monthly rent of $1,435.00, subject to a late fee of $71.75 if not paid by the fifth day of the month due. The Lease also contains a utility and services addendum providing that the Aletis were required to pay certain service charges billed by third parties through Metropolitan for water and sewer service, electric service, and hot water, as well as a flat monthly fee for trash service. The Lease provides that all sums of money required to be paid under it, "whether or not . . . designated as 'rent' or as 'additional rent,' will be deemed to be rent and will be collectible as such."
>
> Two other provisions of the Lease are particularly applicable to the Aletis' claims. First, in a paragraph pertaining to tenant defaults, the Lease provides that, with certain exceptions, the prevailing party will be entitled to

10

recover "attorney's fees and all other litigation costs." The Lease does not otherwise reference charges for legal fees. Second, the final numbered paragraph of the Lease, ¶ 44 provides:

> It is the intent of the parties to comply with the laws of Maryland, including local county and municipal ordinances. . . . In the event no other addendum is attached to this Apartment Lease Contract and the local laws or ordinances provide additional rights or remedies not included herein, this Apartment Lease Contract is amended by reference to such local laws and ordinances to incorporate the terms, rights, or remedies thereof herein. It is the intent of the parties to have this lease construed to include any such rights or remedies herein, and the provisions of such laws or ordinances shall super[s]ede and control over the language of this Apartment Lease Contract to the extent they are in conflict. . . .

## B. The Complaint

On February 24, 2020, the Aletis filed their complaint, in which they alleged that Metropolitan had violated § 5-4 by charging them rent, related service fees, and legal fees while unlicensed. The Aletis alleged that, although the rental property had previously been registered and licensed, the licensure had lapsed on April 9, 2019 and was not renewed until February 7, 2020, a period of 302 unlicensed days. The Aletis alleged that during that period, Metropolitan had improperly charged them a total of $12,825.00 in rent; $50.00 in application fees; $1,675.00 as a security deposit; $1,639.54 in water, electric, and other utility fees; $90.00 in trash fees; $240.00 in legal fees; $498.75 in late fees; and a $35.00 bank fee. The Aletis also alleged that during the unlicensed period, Metropolitan had filed complaints in the District Court for nonpayment of rent in which it had "falsely represented . . . that [10 Light Street] was licensed[.]"

In addition to themselves, the Aletis sought to represent "a class consisting of all tenants who occupied a rental unit at 10 Light Street at any time from April 10, 2019, through February 6, 2020, and paid rent or any other compensation to [Metropolitan] for the occupancy or Legal Fees[.]" The Aletis alleged that they met the numerosity requirement for a class action because the class would contain "more than 100 members . . . because the Rental Property is advertised as having 419 separate rental units."

The complaint contained four counts. In Count I, the Aletis requested a declaratory judgment that the leases "entered into between April 10, 2019, through February 6, 2020, are void and unenforceable and that

11

[Metropolitan] may not file [court actions for failure to pay rent] or collect Legal Fees, rent and other compensation during the 302 days when the Rental Property was not properly registered and/or licensed." In Count II, the Aletis sought money damages, in the amount of all rent and other compensation paid to Metropolitan during the 302 days it was unlicensed, for Metropolitan's violation of § 5-4(a). In Count III, the Aletis sought to recover the same amounts plus a refund of legal fees as restitution damages based on the common law cause of action for money had and received. And in Count IV, the Aletis alleged breach of contract based on ¶ 44 of the Lease, which they contended incorporated § 5-4(a).

## C.      *The Motion to Dismiss*

Metropolitan moved to dismiss all counts of the complaint on the grounds that the Aletis' statutory count failed for lack of a private cause of action, their common law count failed because the contract had been fully executed, and their breach of contract count failed because they had received all of the benefits for which they contracted and had not sustained any damages. Metropolitan further contended that the Aletis' declaratory judgment count should be dismissed as moot if the court dismissed the other counts. The Aletis opposed dismissal.

On June 24, 2020, after a hearing, the circuit court granted the motion to dismiss all counts of the complaint. The court agreed with Metropolitan that § 5-4(a) did not create a private right of action. In dismissing the count for money had and received, the court found that the Aletis had failed to plead with specificity "that they paid more than what they would have paid" but for the violation of § 5-4. And having found that the Aletis had no claim under § 5-4(a) itself, the court concluded that they also had no contractual claim based on the incorporation of that provision into the Lease. The court then declined to issue a declaratory judgment because, based on the dismissal of "the substantive counts, there remains no issue of justiciable controversy for which a declaratory judgment would be warranted."

Following the entry of a written order dismissing the complaint, the Aletis timely appealed.

The Court of Special Appeals largely agreed with the circuit court's order. *Aleti*, 251 Md. App. at 482. Specifically, the Court of Special Appeals held that § 5-4(a)(2) of Article 13 of the Baltimore City Code does not provide a private right of action to recover

12

rent and related payments made by a tenant to a landlord who was unlicensed during the rental term, but who otherwise complied with the terms set forth in the lease. *Id.* at 511.

The intermediate appellate court also held that the Aletis failed to state a claim for breach of contract to recover payments made to the landlord under the Lease, reasoning that given the court's determination that § 5-4(a)(2) does not provide a private right of action to the tenants, no such right or remedy could be incorporated into the Lease. *Id.* at 512. The Court of Special Appeals also determined that the Aletis did not identify any material breach of the Lease or any cognizable damages from any such breach. *Id.* at 513.

The Court of Special Appeals reversed two aspects of the circuit court's judgment. On the Aletis' claim for money had and received, the intermediate appellate court held that the circuit court did not err in dismissing the count as it pertained to the Aletis' payments for rent or related fees that they paid during the unlicensed period. *Id.* at 514. However, the Court of Special Appeals concluded that the circuit court "erred in dismissing the Aletis' claim as to any legal fees that Metropolitan may have collected during the unlicensed period in connection with bringing actions for nonpayment of rent." *Id.*

Finally, the Court of Special Appeals concluded that the circuit court erred in dismissing Count I of the complaint without entering a declaratory judgment related to the Aletis' request for a declaration of the rights of the parties pertaining to whether Metropolitan, having obtained its license, could collect unpaid rent from tenants that was attributable to the period in which it was not licensed. *Id.* at 521. The Court of Special Appeals vacated the judgment entered with respect to Count I and remanded the case for the circuit court to consider that count. *Id.* at 521–22.

13

For the reasons set forth below, we agree with the Court of Special Appeals and affirm the judgment entered by that court in its entirety.

## III

## Discussion

This case involves several questions of law, which we review *de novo*. Specifically, we must determine whether a local law enacted by the Baltimore City Council establishes an implied private right of action for restitution or disgorgement of rent based upon a landlord's lack of licensure alone. We must also determine whether the Aletis' complaint adequately set forth a common law cause of action for money had and received and for breach of contract. These questions of law all arise in connection with the circuit court's dismissal of the Aletis' complaint.

Under Maryland Rule 2-322(b)(2), the court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." A motion to dismiss is properly granted where the factual allegations in a complaint, if proven, would not provide a legally sufficient basis for the cause of action asserted in the complaint. *See, e.g.*, *Barclay v. Castruccio*, 469 Md. 368, 374 (2020). This Court reviews "a trial court's grant of a motion to dismiss, without deference, to determine whether it was legally correct." *Id.* at 373. In doing so, "we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings." *Id.* at 373–74 (quoting *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 121 (2007)). A motion to dismiss on this ground may only be granted where the allegations presented do not state a cause of action. *Barclay*, 469 Md. at 374. In determining whether a plaintiff has alleged claims

14

upon which relief can be granted, there is a big difference between that which is necessary to prove the elements and that which is necessary to merely allege them. *Lloyd*, 397 Md. at 121–22. Indeed, our decision does not "pass on the merits of the claim," but instead, we merely "determine[] the plaintiff's right to bring the action." *Id.* at 122.

Before we address the specific language of the Baltimore City local law, and the Aletis' assertion that it establishes an implied right of action for restitution or disgorgement of rent, it is useful to examine our case law in which tenants have made claims seeking the identical remedy of restitution of rent. Indeed, the only difference between those cases and the instant case is that in the former cases, the tenants sought to obtain restitution by pleading their cases differently. As reflected below, we have rejected identical claims by tenants seeking a judicial remedy of restitution or disgorgement of rent without evidence of actual damages under the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Commercial Law Article ("CL") § 13-101 *et. seq.* (1974, 2013 Repl. Vol., 2021 Supp.), and under common law actions seeking the remedy of restitution.

The remedies provided by our judicial decisions and the Maryland General Assembly within the context of the MCPA are particularly instructive here because "the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State." *McCrory Corp. v. Fowler*, 319 Md. 12, 20 (1990), *superseded by statute as stated in Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 627–29 (2010). Indeed, a local government such as Baltimore City, which derives its authority from the Home Rule Amendment, Article XI-A of the Maryland Constitution, may establish a judicial cause of action pursuant to a local

15

law on a matter of purely local concern, *only* where the General Assembly gives a local government the authority to do so pursuant to the express powers granted to the local government. *See, e.g., Edwards Sys. Tech. v. Corbin*, 379 Md. 278 (2004).

As discussed below, if we were to accept the Aletis' argument that the Baltimore City Council created an implied private right of action enabling city tenants to seek a judicial remedy of restitution or disgorgement of rent based upon a lack of license alone, we would be recognizing a private right of action created by a *local law* that is *inconsistent* with the remedies provided under the common law or by the General Assembly. Because we have determined that Baltimore City did not intend to create an implied private right of action, we do not decide here whether they have the authority to do so.[8]

### A. *Existing Remedies Available to Tenants Where a Landlord is Unlicensed*

In the rental housing context, our jurisprudence firmly establishes the right of a tenant to bring a private right of action under the MCPA where a landlord violates a local rental license law, and where the tenant can prove that the tenant suffered actual injury or loss in connection with the unlicensed status of the property.[9]

---

[8] As an alternative ground for affirming the dismissal of Count II, Metropolitan argues that the City Council lacks the constitutional authority to create a private right of action. Metropolitan made a similar argument before the Court of Special Appeals. Like that Court, "because we conclude that the City Council did not create an implied cause of action to enforce § 5-4(a)(2), we do not need to reach the question of whether it could have done so." *Aleti v. Metro. Baltimore, LLC*, 251 Md. App. 482 n.10 (2021).

[9] In addition to the remedy provided by the MCPA where a tenant can prove that the lack of licensure caused the tenant to suffer actual injury or loss, the tenant has other statutory remedies to ensure the tenant's right to safe and habitable living conditions during the term of the tenancy. We recently summarized these remedies in *Velicky v. Copycat Building, LLC*, 476 Md. 435, 460–466 (2021).

16

In *CitaraManis v. Hallowell*, 328 Md. 142 (1992), we considered whether a tenant could maintain a private right of action under the MCPA or under a common law action for restitution, to recover rent paid in connection with the property they had rented that was not licensed as required by the Howard County Code. The tenants did not allege that the lack of licensure caused them any injury or loss, and the condition of the house was acceptable during the tenancy, which lasted one-and-a-half years. *Id.* at 145. However, after learning that the property was not licensed, they filed suit to recover the amounts they had paid as damages under the MCPA and as restitution of voluntary payments made under an illegal lease. *Id.*

After the circuit court ruled in favor of the tenants, we reversed the circuit court's judgment. We pointed out that under the plain language of the private action provisions of the MCPA, a plaintiff must prove "actual injury or loss sustained." *Id.* at 151 (citing CL§ 13-408(a)) (internal quotations omitted). We discussed the public and private remedies that are available under the MCPA, observing that a consumer who has been subjected to an unfair, abusive, or deceptive trade practice "may elect to utilize either the public or private enforcement proceedings available under the [M]CPA or may utilize both public and private enforcement proceedings, either simultaneously or in the alternative." *Id.* at 151. We noted that in a *public proceeding* under the MCPA, *any* prohibited practice is a violation *regardless* of whether the "consumer in fact has been misled, deceived, or damaged as a result of that practice." *Id.* at 152 (quoting CL § 13-302) (emphasis added). By contrast, to maintain a *private* enforcement proceeding, we pointed out that the express terms of the MCPA "*only* permit[] a consumer to recover for *injury or loss* sustained by

17

him as the result of a practice prohibited by this title." *Id.* (quoting CL § 13-408(a)(1)) (internal quotations omitted) (emphasis added).

Based upon the language in CL § 13-408(a), we concluded that the private action "therefore, requires an aggrieved consumer to establish the nature of the actual injury or loss that he or she has allegedly sustained as a result of the prohibited practice." *Id.* We stated that "[t]his statutory construction creates a bright line distinction between the public enforcement remedies available under the [M]CPA, and the private remedy available under [CL] § 13-408(a)." *Id.* We also observed that "*awarding full restitution of the rent paid by the tenants who offered no proof of actual injury or loss would be in the nature of a punitive remedy*," serving to penalize the landlords for their failure to obtain a license and to serve as a general deterrent to similar conduct by other landlords generally. *Id.* at 153 (emphasis added). We explained that CL § 13-408(a) "was not intended to punish the landlord or set an example for similar wrongdoers." *Id.* Accordingly, we held that the plaintiff tenants could only recover on their private MCPA claim against their landlord for deceptive trade practices arising from renting an unlicensed apartment if they could prove that the unlicensed condition caused them to suffer an "actual injury or loss." *Id.* at 164.

We similarly rejected the tenant's claim for restitution of rent based upon a common law theory that they had paid "pursuant to an illegal and unenforceable lease." *Id.* at 158. We explained that "even if the lease were unenforceable by the landlords, the tenants have received everything that they bargained for, and a necessary element justifying the remedy of restitution, *i.e.*, unjust enrichment, is lacking." *Id.* at 159.

18

In *Galola v. Snyder*, a companion case to *CitaraManis*, we held that the circuit court erred in granting summary judgment in favor of a tenant against an unlicensed landlord based upon proof of voluntary payment of rent. 328 Md. 182, 185–86 (1992). We rejected the tenant's argument that the tenant could maintain a private right of action under the MCPA or a common law action for restitution of rent based solely upon the unlicensed status of the leased property. *Id.* However, unlike the facts in *CitaraManis*, there was evidence that the tenant was harmed because the property contained defects that would have been uncovered by an inspection. *Id.* at 184–85. We therefore remanded the case for a trier of fact to determine whether the tenants suffered actual loss or injury arising from the condition of the unlicensed property. *Id.*

In *McDaniel v. Baranowski*, 419 Md. 560, 562–63 (2011), we considered whether an unlicensed landlord could initiate a summary ejectment proceeding for a tenant's failure to pay rent. A rental license was required under the Anne Arundel County Code for all multi-family dwelling units. At the time that the tenant rented the apartment, she was unaware that the property was not licensed as the landlord had failed to renew its license for several years. *Id.* at 564–65. When the tenant failed to pay rent after the first month, the landlord filed a complaint for summary ejectment pursuant to § 8-402 of the Real Property Article of the Maryland Code. *Id.* at 567. The tenant, who had discovered that the property was unlicensed, argued that the landlord should be precluded from bringing a summary ejectment proceeding because he was unlicensed. *Id.* at 568–69. In addition, the tenant filed a counterclaim under the MCPA to recover the rent that she had paid.

19

We agreed with the tenant that the landlord should not be permitted to utilize the summary ejectment process, concluding that "a landlord [should] not be able to seek to dispossess a tenant, summarily, without having a license to operate the leased premises as required by local ordinance." *Id.* at 585. However, we upheld the District Court's denial of the tenant's counterclaim. We determined that the "present case is analogous to *CitaraManis*, because [the tenant] failed to present any evidence that she sustained any actual damages, such as bills for medical treatment, loss of wages, or the cost of securing suitable substitute housing, for example." *Id.* at 587–88. Based upon this analysis, we agreed with the District Court that the tenant in *McDaniel* "failed to prove actual loss or injury, a prerequisite to recovery under the [MCPA]." *Id.* at 588.

To summarize our case law where we have analyzed tenants' claims for restitution of rent within the context of other types of private causes of action, for over 30 years, we have consistently held that a tenant may only pursue a private action under the MCPA against an unlicensed landlord where the tenant can prove that the unlicensed condition caused them to suffer an "actual injury or loss." Simply alleging a lack of licensure is not enough. Nor will the Court permit the tenant to maintain a common law action seeking a remedy of restitution to recover unpaid rent under circumstances where the tenant voluntarily paid the rent and received everything that they bargained for, because the necessary element justifying the remedy of restitution—unjust enrichment—is lacking.

The Aletis assert that their claims are different from the claims asserted by the tenants in *CitaraManis* and *McDaniel*, because they contend that their judicial remedy

20

arises under a different private right of action—an implied one they assert has been created by the local law enacted by the Baltimore City Council. Metropolitan argues that the local law does not provide a private right of action. For the reasons set forth herein, we agree with Metropolitan.

### B. Implied Right of Action Count

A private right of action allows an individual to bring an action in his or her personal capacity to enforce a legal claim. *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 517 (2014). Of course, § 5-4(a)(2) does not, by its plain language, create an *express* private right of action for the judicial remedy of restitution or disgorgement of rent for tenants who live in an unlicensed dwelling. Nor do the Aletis claim that subpart (2) creates an express private right of action. Where, as here, a statute or ordinance "does not explicitly provide a cause of action" for claimants who "ha[ve] adequately alleged a violation," we must assess whether there is an implied right of action. *See Scull v. Groover, Christie & Merritt, P.C.*, 435 Md. 112, 121 (2013). "A private cause of action in favor of a particular plaintiff or class of plaintiffs does not exist simply because a claim is framed that a statute was violated and a plaintiff or class of plaintiffs was harmed by it." *Baker v. Montgomery County*, 427 Md. 691, 708–09 (2012) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979)). "Rather, the issue is a matter of statutory construction." *Baker*, 427 Md. at 709 (citations omitted).

In determining whether a state statute contains an implied private right of action, we have adopted the same test applied to federal statutes by the Supreme Court. *Scull*, 435

21

Md. at 121; *Baker*, 427 Md. at 709 (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975)).  That test requires that we consider three relevant factors:

    (1) Is the plaintiff one of the class for whose special benefit the statute was enacted?

    (2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

    (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Baker*, 427 Md. at 709 (quoting *Cort*, 422 U.S. at 78) (cleaned up); *see also Scull*, 435 Md. at 122.

In *Baker*, we discussed in detail the application of this test.  Specifically, we noted that "'[t]he central inquiry remains whether [the legislative body] intended to create, either expressly or by implication, a private cause of action.'"  *Id.* at 710 (quoting *Touche Ross*, 442 U.S. at 575–76).  In discerning legislative intent, we analyze

> the language of the statute to identify its purpose and intended beneficiaries, review[] the statute's legislative history, and determine[] whether the statute provides otherwise an express remedy.  As a result, in a case in which neither the statute nor the legislative history reveals a legislative intent to create a private right of action for the benefit of the plaintiff, we need not carry the *Cort v. Ash* inquiry further.

> Thus, our analysis begins with the language of the statute at hand and whether it confers a beneficial right upon a particular class of persons.  If a statute's language provides a right to a particular class of persons, there is a strong inference that the legislature intended the statute to carry an implied cause of action.  Conversely, that inference becomes attenuated when the statute is framed as a general prohibition or a command to a governmental entity or other group or confers a generalized benefit.

*Baker*, 427 Md. at 710–11 (internal citations and quotations omitted).

As previously noted, the genesis of the implied right of action asserted by the Aletis is the City Council's modification to § 5-4 that was effectuated by the adoption of the 2018 amendment. Notably, § 5-4(a) contains two subparts. Subpart (1) prohibits any person from renting or offering to rent to another any rental dwelling in the absence of a currently effective license. The Aletis focus solely on subpart (2), which they contend creates an implied right of action entitling Baltimore City tenants to a seek the judicial remedy of disgorgement or restitution of any rent paid during the period that they occupied an unlicensed dwelling, regardless of the condition of the property and without pleading that the unlicensed status caused the tenant any injury or damages. Applying the three-factor test from *Cort*, for the reasons that follow, we hold that no such implied private right of action was created by the 2018 amendment that revised the language contained in § 5-4(a) of the Baltimore City Code.

1. *Section 5-4(a)(2) Was Enacted for the Purpose of Requiring All City Rental Properties to be Licensed—Not to Provide Tenants with a Special Benefit of Free Housing in Unlicensed Properties*

The first factor that we consider is whether the 2018 amendment was enacted for the special benefit of a class of whom the Aletis are a part. In other words, we consider whether § 5-4(a)(2) was enacted to provide a "beneficial right" to tenants. *Baker*, 427 Md. at 710. "If a statute's language provides a right to a particular class of persons, there is a strong inference that the legislature intended the statute to carry an implied cause of action. Conversely, that inference becomes attenuated when the statute is framed as a 'general prohibition or a command' to a governmental entity or other group or confers a generalized benefit." *Id.* at 710–11 (internal citations omitted) (quoting *Universities Res. Ass'n v.*

23

*Coutu*, 450 U.S. 754, 772 (1981)). The question of whether an enactment benefits a special class "is not simply who would benefit from the [enactment], but whether [it was] intended to confer . . . rights upon those beneficiaries." *California v. Sierra Club*, 451 U.S. 287, 294 (1981). The law at issue must therefore "unmistakably focus on [a] particular class of beneficiaries whose welfare [the legislature] intended to further," *id.*, and not be a generalized "prohibitive command." *Baker*, 427 Md. at 711.

The Aletis' assert that, by prohibiting a "person" from charging or collecting rent from "another" for an unlicensed property, the provision necessarily reflects an intent to benefit tenants because they are the "another" from whom rent and other fees may not be collected. We agree with the Court of Special Appeals that the fact that tenants might benefit from the prohibition on the collection of rent does not mean that the City Council desired or intended that outcome. Section 5-4(a)(2) cannot be read in isolation—without considering subpart (1), as well as the remainder of the statutory scheme and the legislative history of the 2018 amendment.

Generally, local housing and inspection codes are enacted pursuant to a local government's police powers to enact general regulations for the protection and benefit of the health, safety, and welfare of the public. Baltimore City is no exception. *See, e.g.*, *Velicky v. Copycat Bldg. LLC*, 476 Md. 435, 477 (2021) (observing that requiring a landlord's compliance with the Baltimore City "inspection and licensing process to engage in rental activities is a legitimate exercise of governmental police powers to ensure that residential housing complies with public health and safety standards"); *Golt v. Phillips*, 308 Md. 1, 13 (1986) (stating that "[w]e find that the Baltimore City licensing requirement

24

for multiple family dwellings is a model example of a public health and safety regulation"). Like the Court of Special Appeals, we agree that the City's residential license laws set forth in Article 13, Subtitle 5, must be read within the overarching goals of Article 13, as set forth in § 2-1, which include the prevention of deterioration of areas within the City, "which constitute a serious and growing menace, injurious and inimical to the public health, safety, morals and general welfare of the residents of the City of Baltimore[.]" As reflected in the broad declarations contained in § 2-1(b), "the enforcement of applicable regulatory codes relating to building, housing, sanitation or safety," is intended to prevent the spread of the "evils" enumerated in § 2-1(a)(2), including: the "spread of disease and crime"; "losses by fire and accident"; "aggravate[d] traffic problems"; "depreciate[ing]  assessed values" of property; "caus[ing] an abnormal exodus of families from the city"; and other conditions that are "detrimental to the health, the well-being and dignity of many of the residents of the City[.]" To be sure, the residential license laws certainly benefit tenants. However, we agree with the Court of Special Appeals that the "Code makes plain that the City Council's focus was broader." *Aleti*, 251 Md. App. at 506; *cf. Erie Ins. Co. v. Chops*, 322 Md. 79, 91 (1991) (in the course of rejecting a claimed private right of action under § 17-106(b) of the Transportation Article of the Maryland Code, we stated that, "[a]lthough the [plaintiffs] may properly be said to be within the class of persons in whose favor the statute was intended, it seems equally apparent that the principal focus of the uninsured motorist laws is for the general protection of the public").

When we read the 2018 amendment that adopted the current language contained in § 5-4(a)(2) within the context of the "comprehensive and integrated program," including

25

the purpose and declaration contained in § 2-1, in addition to the legislative history of the 2018 amendment itself, which we discuss below, we determine that the City Council's intent was to require that *all* rental properties in the City be licensed, which in turn, benefits the tenants as well as the City and the public generally. We agree with the Court of Special Appeals, that, when one reads § 5-4(a)(2) within the overall scheme, the prohibition against "charging, accepting, retaining, or seeking to collect rent during a period of non-licensure is to promote licensure." *Aleti*, 251 Md. App. at 506. Indeed, we can say it no better than our colleagues on the intermediate appellate court: "We see nothing in the statutory scheme broadly or in § 5-4(a)(2) specifically that suggests an intent to specially benefit tenants by providing them with free, unlicensed housing. To the contrary, the apparent legislative intent was for there to be no unlicensed housing, and § 5-4(a)(2) is a coercive mechanism to effectuate that intent." *Id.* at 506–07. Reading § 5-4(a)(2) *along with* subpart (1), as well as the legislative history discussed below, it is clear that the intent of the Baltimore City Council was to bring all rental properties—multi-unit dwellings, as well as non-owner-occupied one- and two-family units—within the general welfare licensing scheme, and it was not to confer a special benefit upon Baltimore City tenants in the form of a judicial remedy of restitution or disgorgement of rent. In other words, there is no intent manifested anywhere in § 5-4 to provide tenants with unlicensed housing at no cost, because the ultimate goal of the section was for there to be *no* unlicensed housing.

*2. There Is No Indication of Legislative Intent to Create an Implied Private Right of Action to a Judicial Remedy of Restitution or Disgorgement of Rent*

Turning to the second factor of the *Cort* test, there is nothing in the legislative history of City Council Bill 18-0185 that reveals an intent to benefit a particular class of persons, specifically, City tenants, in the form a judicial remedy for restitution of rent. As noted above, the expressly stated purpose of Bill 18-0185 reflects the clear intent of the City Council in enacting the amendment to Article 13, Subtitle 5: (1) to expand the City's regulatory rental licensing scheme to bring *all* rental properties within its ambit rather than just multi-unit dwellings; and (2) utilize third-party inspectors to reduce the burden on the City's inspectors generated by the increased number of units that would be required to be inspected under the expanded license program.

In addition to the lack of any indication of legislative intention in the Bill's express statement of purpose, there is *no mention* of any intention to create a private right of action in any of the comments generated by any City departments that offered testimony in support of the Bill. Perhaps most notable are the written comments in support of the Bill that were prepared by Michael Braverman, Housing Commissioner, Baltimore City Department of City Housing and Community Development ("HCD"). After reciting the Bill's express purpose statement verbatim, the Housing Commissioner noted that:

> If enacted, this bill would improve the overall quality of rental housing in the City by expanding HCD's current rental inspection program to require all rental properties in the City to be registered, inspected and licensed. The current law requires all non-owner occupied dwelling units to be registered[,] but the inspection and licensing requirements only apply to properties with either two dwelling units and some other additional use or more than two dwelling units.

The Housing Commissioner went on to explain that the new requirements "would also add a new inspection and licensing requirement" for one- and two-family dwelling units, which "account for a significant portion of the 43% of all rental units in Baltimore City that rent for less than $750 [per] month." Explaining that these units substantially contribute to the City's affordable housing inventory, the Commissioner explained that the requirements "will largely eliminate substandard conditions in the one segment of the affordable housing market where such conditions are prevalent." The Commissioner commented on two additional amendments to the City's rental license law that would be effectuated by the Bill's enactment—specifically, the new requirement that inspections would be performed by third-party licensed home inspectors instead of City inspectors, and the establishment of a three-tiered license renewal system that would have a one-, two- or three-year term for the license.

In his written comments, the Housing Commissioner offered two amendments to the Bill. The first amendment requested that additional language be added to § 5-7(b)(4) requiring that the third-party inspector's report be "signed by the home inspector, under oath and under the home inspector's seal," which the Commissioner stated would "allow for appropriate legal action against the inspector for submitting any false reports." The second amendment offered was to clarify the language in the definition of "Nuisance Property" in § 5-15(a) to make it clear that the definition included a "public nuisance, neighborhood nuisance and/or an unruly social event."

In its written comments, the Department of Planning recommended approval of the Bill and deferred to the comments provided by HCD "as the most directly-affected agency."

In a letter in support of the Bill from the Baltimore City Police Department, the Chief of Staff, James Gillis commented that "[t]his legislation, among other things, provides valuable tools for making our City safer. Crime is often a result of underlying factors that give rise to criminal conduct. Unsafe, unhealthy, and unchecked housing—whether vacant or occupied—are examples of such underlying factors." In support of the Bill, the written comments submitted by the City Department of Finance noted that "the main purpose [of Bill 18-0185] is to add certain non-owner-occupied 1- and 2-family dwellings to the licensing, inspection, and related requirements for multi-family dwellings and rooming houses," and also observed that the "proposed legislation would now require property owners to pay out-of-pocket for a third party housing inspection" by licensed inspectors "registered with the Housing Commissioner" who "must meet the same standards as a City inspection." Giving the Bill a favorable recommendation, the Department of Finance concluded that the Bill "would increase efficiency within the Department of Housing and allow housing inspectors to focus on quality control and oversight of the City's rental housing market to improve the standard of living for our residents."

It is also noteworthy that organizations which would ordinarily be most vocal about a Bill creating a private right of action for disgorgement of rent did not raise concerns about this issue in the written testimony provided by such organizations. The Baltimore

29

Development Corporation ("BDC") was "asked to comment" on the Bill. The BDC stated that:

> While BDC generally has concern for regulations that present an undue burden on private enterprise, inhibit the competitiveness of Baltimore City in the regional, national, or global market, or present high regulatory barriers to entry for prospective businesses, we believe that the proposed regulation provides essential oversight in a segment of the residential rental housing market that is not closely regulated.

BDC noted its concern that "in certain cases, the cost and compliance burdens of this regulation will drive away high-quality landlords who consistently provide quality housing and reasonable rents." As such, BDC observed that the Bill

> could lead to: 1) higher rents to compensate for the additional cost of compliance[;] 2) increased vacant property, as the cost of providing compliant housing exceed the potential rental income the property can generate[;] and 3) reduction in "mom-and-pop" landlords who currently provide safe, affordable housing, but lack the sophistication or will to deal with the additional regulatory burden.

Even so, in supporting the Bill and requesting that it be given favorable consideration, the BDC stated that it believed "that the cost of regulatory compliance . . . is relatively small, and all property owners should bear the cost of bringing a property into habitable, code-compliant condition." The BDC further stated that it "believe[d] that the potential negative effects of the [Bill were] far outweighed by the positive benefits of safe housing for Baltimore City residents."

Another organization, Maryland Multi-Housing Association, Inc. ("MMHA"), which filed a Brief of *Amicus Curiae* in this case, participated in the legislative process by providing testimony, proposing amendments during the drafting stage, and ultimately supporting the adoption of the Bill. In its *Amicus* brief, MMHA states that its support of

30

the Bill was based on an understanding that it did not provide tenants with a judicial remedy to demand a refund of all rent paid during an unlicensed period. According to MMHA, this "interpretation was not considered during the legislative process, as it was not the intent of the legislation, and MMHA would not have supported" the Bill's passage if it had been.

On the other side of the debate, there is similarly no reference or discussion by public interest groups such as the Public Justice Center or the Legal Aid Bureau to indicate that these organizations believed that the intent of the Bill was to provide tenants with a judicial remedy of rent refunds in the form of a private right of action for restitution or disgorgement of rent.

Nor is there any evidence in the public testimony or discussion by the City Council that the Bill intended to create a private right of action. The Bill Synopsis prepared by the City's Judiciary and Investigations Committee makes no reference to the creation of a private right of action that would entitle tenants to a refund of rent paid during the unlicensed period of occupancy. The PowerPoint presentation prepared by Jason Hessler, Assistant Commissioner of the HCD, titled "Rental Licensing Bill 18-0185" provided the public with an overview of the current law, the proposed amendments and the "highlights" of the Bill. There is no reference to the Bill creating a private right of action for restitution of rent.

Finally, and perhaps most significantly, the City's Department of Law weighed in on Bill 18-0185. The City's Department of Law, which provided written comments as part of its review of the Bill "for form and legal sufficiency," did not discuss or mention the possibility of any language contained therein as creating a private right of action. As

31

discussed above, a private right of action for restitution of rent based upon *lack of licensure alone*, would create a judicial remedy that is *inconsistent with* the remedies provided to tenants under the MCPA and common law as articulated by this Court in *CitaraManis v. Hallowell*, 328 Md. 142 (1992), *Galola v. Snyder*, 328 Md. 182 (1992), and *McDaniel v. Baranowski*, 419 Md. 560 (2011). Had the City Council intended to create a private right of action purporting to expand judicial remedies in a manner that is inconsistent with the remedies provided by the Maryland General Assembly in the context of the MCPA and the holdings of this Court, surely the City's Department of Law[10] would have commented on that fact.

Where "the plain language of a provision weighs against implication of a private remedy, silence within the legislative history as to a private cause of action reinforces the decision not to find such a right implicitly." *Baker*, 427 Md. at 714 (internal quotation marks and citations omitted). As we noted in *Scull*, "[w]hile legislative silence is not conclusive, [it] certainly weighs against finding a private right of action." 435 Md. at 123. Here, there is nothing in the legislative history that even hints at the notion that the City Council intended to create a private right of action providing for a judicial remedy for the disgorgement of rents paid during an unlicensed period.

---

[10] The City's Solicitor at the time of the Bill's consideration and ultimate enactment was Andre M. Davis, former judge of the United States Court of Appeals for the Fourth Circuit.

### 3. Implying a Private Right of Action is Not Necessarily Consistent with the Underlying Purpose of the City's Rental License Scheme

We turn to the third factor under the *Cort* test—whether establishing a tenant's private right of action to obtain restitution of rent based upon a lack of licensure alone would be "consistent with the underlying purposes of the legislative scheme." *Baker*, 427 Md. at 709 (quoting *Cort*, 422 U.S. at 78). To be sure, the creation of a private right of action would certainly encourage landlords to comply with the license requirement lest they be required to refund any and all rent paid during the unlicensed period. However, it is also entirely reasonable that the City Council did not intend to enact such a punitive remedy. As we noted in *Velicky*, 476 Md. at 440 n.4, and observe once again here, under Baltimore City's current licensing scheme, the City routinely issues a single license for an entire building that encompasses all the individual units in a multi-unit dwelling, instead of a license for each unit. *See* Art. 13, § 5-6 (stating that "*a* rental dwelling license may be issued or renewed" "only if," among other requirements, "all dwelling units and rooming units are currently registered" and "the premises have passed an inspection") (emphasis added) (capitalization omitted). While the City's policy of issuing a single license for one building makes things easier for the City from an administrative and efficiency standpoint, it also means that a single problem affecting one unit in a multi-unit building prevents the property owner from obtaining or maintaining a rental license for every other unit in the building. Here, the members of the putative class include tenants in a 34-story high rise containing over 300 apartments who paid rent over the course of 10 months when the property was not licensed. The Aletis' interpretation of § 5-4(a)(2)—creating an implied

33

private right of action entitling each tenant to a judicial remedy of restitution of rent based upon a lapse in licensure alone without regard to the reason for the lack of licensure—could have significant economic consequences for City landlords, including landlords whose license has lapsed by mere inadvertence. We have rejected tenants' attempts to avail themselves of such a punitive remedy under our interpretation of a private right of action under the MCPA as well as a common law action for restitution. *See CitaraManis*, 328 Md. at 153 (noting that "awarding full restitution of the rent paid by the tenants who offered no proof of actual injury or loss would be in the nature of a punitive remedy"); *Galola*, 328 Md. at 186 (holding that "voluntary payment of rent under an unenforceable lease" because the unit was unlicensed "does not entitle a tenant to restitution of that rent unless the tenant can establish that he or she was provided less than she had bargained for in the lease"). We agree with the Court of Special Appeals that it is quite possible

> that the City Council might conclude that the existence of such a private right of action might undermine the overarching goals reflected in § 2-1 of Article 13 if, for example, claims for repayment of rent were to imperil the continued financial viability of a landlord who was, for a significant period of time, unknowingly out of compliance with the licensing requirement but compliant with all of the prerequisites for licensure. That possibility might be especially acute for small landlords renting one- and two-unit dwellings, to whom the City Council extended the licensing requirement at the same time it enacted § 5-4(a)(2). Perhaps for those reasons, the remedies for violations that are expressly created in the ordinance are [those public enforcement remedies] left to the discretion of executive authorities.

*Aleti*, 251 Md. App. at 510–11.

In conclusion, there is simply no discernible legislative intent to create an implied right of action in the plain language and structure of the statute, or its legislative history. Assuming, without deciding, that the General Assembly has given the City Council the

34

authority to enact a local law to establish such a private right of action, we hold that there is no basis for determining that it exercised such authority.

### C.  *Money Had and Received Count*

We turn next to the Aletis' assertion that the circuit court erred in dismissing their claim for money had and received.  The Aletis contend that the lower courts failed to properly apply the principles articulated by this Court in *Bourgeois v. Live Nation Ent., Inc.*, 430 Md. 14 (2013).  The Aletis allege that § 5-4(a)(2) provides tenants with "specific protections from a landlord of an unlicensed property who collects and retains rent[,] and [therefore the tenants] are entitled to the common law remedy of money had and received whether or not the lease has been fully performed."  The Aletis argue that, "at bottom, landlords should not be able to profit from their violation of . . . § 5-4(a)."  Through this common law action, the Aletis are seeking a refund of all payments made during the 302 days when 10 Light Street was unlicensed.  According to the complaint, these payments fall into two categories: (1) rent payments and related fees, such as utility fees, trash fees, and late fees; and (2) legal fees that Metropolitan charged them in pursuing court actions for failure to pay rent.  Metropolitan counters that a cause of action for money had and received "does not lie on an executed contract" and would unjustly enrich the Aletis.

We agree with the Court of Special Appeals that the circuit court did not err in dismissing the claim for money had and received for the Aletis' payment of rent or related fees that they paid during the unlicensed period.  *Aleti*, 251 Md. App. at 514.  However, like the intermediate appellate court, we also conclude that the circuit court did err in dismissing the Aletis' claim as to any legal fees that Metropolitan may have collected

35

during the unlicensed period in connection with bringing actions for nonpayment of rent. We explain our reasoning below.

### 1. Common Law Action for Money Had and Received – Generally

An action for money had and received is one of the "common counts" or "common money counts" that developed under English common law as a branch of the common law writ of *assumpsit*. *Bourgeois*, 430 Md. at 45. The common counts were "developed as standard and handy descriptions of a number of set fact patterns for quasi-contractual restitution in General Assumpsit." *Alts. Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 476 (2004).[11] As the Court of Special Appeals noted, "[t]he counts are thus 'particular kinds of quasi-contract' that 'refer to fact patterns which may call for restitution to prevent unjust enrichment.'" *Aleti*, 251 Md. App. at 514 (footnote omitted) (quoting *Alts. Unlimited, Inc.*, 155 Md. App. at 476) (quoting 1 Dan B. Dobbs, *Law of Remedies* 581 (2d ed. 1993)). Money had and received is a common law count that "lies whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not be allowed to retain." *Bourgeois*, 430 Md. at 46 (quoting *Benson v. State*, 389 Md. 615, 652–53 (2005)).

As the Court of Special Appeals noted, "[a]lthough money had and received is an action at law, our courts have long held that it is governed by equitable considerations."

---

[11] In *Alternatives Unlimited*, the Court of Special Appeals noted that the "more familiar" common counts include "1) money paid to the defendant's use, 2) money had and received; 3) use and occupation of land, 4) goods sold and delivered, 5) quantum valebant ('how much were the goods worth?'), and 5) quantum meruit." 155 Md. App. at 476–77 (cleaned up) (citing 1 Dan B. Dobbs, *Law of Remedies* 581–83 (2d ed. 1993)).

*Aleti*, 251 Md. App. at 515 (citing *State to Use of Emp. Sec. Bd. v. Rucker*, 211 Md. 153, 157–58 (1956)) ("[T]he gist of [the money had and received] action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.") (citation omitted); *Callahan v. Linthicum*, 43 Md. 97, 105 (1875) ("[M]oney had and received, is an equitable action . . . and the plaintiff, in support of it, can resort to all equitable circumstances incident to his case."). "Because of its origins in quasi-contract, a claim for money had and received generally 'allows the recovery of money paid under a contract still executory in nature,' and is 'generally not to recover money paid under a fully executed contract.'" *Aleti*, 251 Md. App. at 515 (quoting *Bourgeois*, 430 Md. at 49) (cleaned up).

In *Bourgeois*, we discussed the common law action for money had and received at length. In that case, ticket purchasers sued ticket agencies in the United States District Court for the District of Maryland, alleging that the agencies violated a Baltimore City ordinance by collecting excessive service charges for tickets sold in connection with events in the City. 430 Md. at 17–18. Among the counts pled by the plaintiffs was a count for money had and received, in which plaintiffs sought restitution of the amounts collected by the ticket agencies over and above what was permitted by the ordinance. *Id.* at 18–19.

In answering certified questions from the federal court, we confirmed that Maryland continues to recognize an action for money had and received. *Id.* at 46. We then concluded that such an action could lie to recover money for the service charges that were prohibited by the City ordinance. We observed that Maryland courts have found the action to be available to recover money paid under mistake of fact, mistake of mixed law and fact, or

37

as "money obtained by fraud or false pretenses, paid upon an unexecuted illegal contract, or, in certain circumstances, paid under an executed illegal contract." *Id.* at 48. The "branch of the action" most applicable to the plaintiffs' claim was recovery of amount paid "pursuant to an illegal, and thus allegedly void, agreement." *Id.* We observed that "recovery in such a case was ordinarily limited 'to recover money paid under an *executory* illegal contract—one not yet fully consummated—but generally not to recover money paid under a fully executed contract.'" *Id.* at 49 (emphasis in original). The reason for this "distinction is that the courts will treat an illegal executory contract as a nullity and order restitution independent of the contract." *Aleti*, 251 Md. App. at 516. "When the contract is fully executed, however, the situation is different, for in that setting, the parties *ordinarily* are *in pari delicto* and neither should be able to take advantage of the illegality." *Id.* "In the case of a fully executed contract, provided 'there are no special circumstances that would preclude a finding that the parties were *in pari delicto*, [an] action [for money had and received] will not lie.'" *Id.* (quoting *Bourgeois*, 430 Md. at 51). "When the case returned to the federal district court, the court found that the plaintiffs could pursue their claim for money had and received because they were not *in pari delicto* with the ticket agencies." *Id.* (citing *Bourgeois v. Live Nation Ent.*, 3 F. Supp. 3d 423, 452 (D. Md. 2014)).

2. *The Aletis' Complaint Fails to State a Cause of Action for Money Had and Received as to Payment of Rent and Related Fees*

Relying on *Bourgeois*, the Aletis contend that they have properly pled a claim for money had and received because they are members of the class that § 5-4(a)(2) was

intended to benefit, Metropolitan violated the ordinance, and the parties are not *in pari delicto*. Metropolitan asserts that unlike the plaintiffs in *Bourgeois*, the Aletis are *in pari delicto* because the lease was fully executed, and, accordingly, they cannot avail themselves of the cause of action for money had and received.

We agree with Metropolitan and hold that the circuit court correctly determined that the complaint does not state a claim on which relief can be made with respect to restitution of rent and related fees. As noted above, an action for money had and received is a quasi-contract cause of action based upon equitable principles that is generally not available where a contract is fully performed. The action lies where the "defendant has obtained possession of money which, in equity and good conscience, [the defendant] ought not be allowed to retain." *Bourgeois*, 450 Md. at 46 (citations omitted). In *CitaraManis*, we expressly rejected a tenant's claim for common law restitution to recover rent paid to an unlicensed landlord in the absence of actual damages, because "the tenants have received everything that they bargained for, and a necessary element justifying the remedy of restitution, *i.e.*, unjust enrichment, is lacking." 328 Md. at 158–59. In other words, where a landlord has provided all that was bargained for, we have held that there is no injustice in permitting the landlord to keep rent and other fees paid under the lease where the tenant's claim is based solely upon the landlord's lack of licensure. We reiterated this holding in *Galola* and *McDaniel*. *See, e.g.*, *Galola*, 328 Md. at 186 (stating that "voluntary payment of rent under an unenforceable lease does not entitle a tenant to restitution of that rent unless the tenant . . . was provided less than [the tenant] had bargained for in the lease"). Stated otherwise, we have already determined under identical circumstances that "equity

39

and good conscience" do not require restitution of those amounts. *Bourgeois*, 430 Md. at 46 (citations omitted).

We agree with the Court of Special Appeals that *Bourgeois* is inapposite to the claims pled by the Aletis here. In *Bourgeois*, the ordinance at issue made it unlawful for ticket agencies to charge certain fees over and above the face value of the tickets being sold. 430 Md. at 17. "The very purpose of the ordinance was thus to protect purchasers of such tickets—including the plaintiffs in that action—from having to pay those charges." *Aleti*, 251 Md. at 517 (citing *Bourgeois*, 430 Md. at 17). "Here, by contrast, the problem was Metropolitan's lack of licensure, not the rent or associated fees it charged." *Id.* We determine that there is no reason for us to deviate from our holding in *CitaraManis*, which we applied in *Galola* and *McDaniel*. We decline to overturn our holding in *CitaraManis* as it relates to the application of the common law remedy of restitution—whether pled in the form of money had and received—or another overlapping common law action sounding in equity. Where a tenant seeks a remedy of restitution of rent based solely on a lack of licensure and without any other damages, the tenant has received the benefit of the bargain. Equity and good conscience do not require restitution of those amounts.

### 3. The Aletis' Complaint Alleges Sufficient Facts to Withstand a Motion to Dismiss Pertaining to Their Claim for Legal Fees Incurred in Connection with Metropolitan's Summary Ejectment Actions

Like the Court of Special Appeals, we reach a different result with respect to the Aletis' money had and received count to the extent that the complaint alleges that they paid Metropolitan's legal fees that Metropolitan charged in connection with actions that Metropolitan filed while it was unlicensed against the Aletis for failure to pay rent. In

40

*McDaniel*, we held that, for a landlord to bring an action for failure to pay rent and for repossession of property under the summary ejectment process set forth under Real Property Article ("RP") § 8-401 of the Maryland Code, the landlord must "possess a current license to operate the premises . . . if the dwelling is located in a jurisdiction that requires owners to obtain such licenses," 419 Md. at 563, and that the landlord "must affirmatively plead and demonstrate that [the landlord] is licensed at the time of the filing of the complaint," *id.* at 587.

In their complaint, the Aletis allege that, during the period that Metropolitan was unlicensed, Metropolitan filed actions against them for failure to pay rent and that Metropolitan collected and continues to retain those legal fees. We agree with the intermediate appellate court that, "[i]f true, those allegations could form the basis of an action for money had and received." *Aleti*, 251 Md. App. at 518 (citing *Bourgeois*, 430 Md. at 48, stating that Maryland cases have recognized grounds for an action for money had and received including mistake of fact or law and money obtained by fraud or false pretenses). Accordingly, we hold that the circuit court erred in dismissing Count III to the extent that the Aletis seek restitution of the amounts that Metropolitan charged them in legal fees for bringing actions against them for failure to pay rent during a period in which it was unlicensed.

### D. The Breach of Contract Count

Next, the Aletis contend that the circuit court erred in dismissing Count IV of the complaint, in which they alleged that Metropolitan breached the lease by charging them

41

rent while it was unlicensed. Their claim is premised on paragraph 44 of the lease, which states as follows:

> It is the intent of the parties to comply with the laws of Maryland, including local county and municipal ordinances . . . . In the event no other addendum is attached to this Apartment Lease Contract and the local laws or ordinances provide additional rights or remedies not included herein, this Apartment Lease Contract is amended by reference to such local laws and ordinances to incorporate the terms, rights or remedies thereof herein. It is the intent of the parties to have this lease construed to include any such rights or remedies herein, and the provisions of such laws or ordinances shall supercede [sic] and control over the language of this Apartment Lease Contract to the extent they are in conflict . . . .

We determine that the circuit court did not err in dismissing the breach of contract count.

First, to the extent that the lease purports to incorporate by reference the "terms, rights or remedies" of applicable laws and ordinances, we have already concluded that § 5-4(a)(2) does not provide a private right or remedy to the tenants. Accordingly, no such "right or remedy" is incorporated into the lease by the above-quoted paragraph.

Second, we agree with the Court of Special Appeals that "the Aletis have not identified any material breach of the lease or any cognizable damages from any such breach." *Aleti*, 251 Md. App. at 512. The Aletis' complaint alleges that they incurred damages "because they paid [Metropolitan] rent and other compensation in exchange for occupancy of the rental property and legal fees during the 302 days when the rental was not properly registered and licensed as required by the Baltimore City Code." *Id.* (capitalization omitted). As we noted above, the intent of the rental license law is to force compliance with the obligation to become licensed, not to provide tenants with rent-free housing in unlicensed dwellings. The Aletis have not alleged the existence of any

42

deficiencies in the apartment that would be become apparent if the apartment had been inspected as part of the licensure process. Aside from their claim related to § 5-4(a)(2), which we have already determined was correctly dismissed by the circuit court, the Aletis do not allege that Metropolitan failed to provide them with the full benefit of the bargain, as reflected in their lease. We agree with the Court of Special Appeals that "they have not pled facts that would establish a material breach of the Lease or resulting damages." *Aleti*, 251 Md. App. at 513 (citing *Barufaldi v. Ocean City, Chamber of Com.*, 196 Md. App. 1, 23 (2010) ("A breach is material when it 'is such that further performance of the contract would be different in substance from that which was contracted for.'")) (some internal quotation marks omitted). We further agree that this result is consistent with our jurisprudence in which we have concluded that a tenant may not recover rent voluntarily paid to an unlicensed landlord due solely to the lack of a license. *See, e.g., CitaraManis*, 328 Md. at 157–58; *Galola*, 328 Md. at 185–86; *McDaniel*, 419 Md. at 587–88.

### E. Declaratory Judgment Count

We will add one final post-script to our opinion which will guide the circuit court on remand. The Court of Special Appeals held that the circuit court erred in declining to issue a declaratory judgment on Count I, in which the Aletis sought a declaration concerning whether Metropolitan, having secured its license, could file failure to pay rent complaints to recover rent attributable to the period in which it was not licensed. The Aletis alleged that Metropolitan has taken the position that its prior lack of licensure did not restrict it from pursuing failure to pay rent complaints or collecting unpaid rent, legal fees, or other compensation in a breach of contract action. Neither party petitioned this Court

43

for review of the Court of Special Appeals' holding on the declaratory judgment count, and that matter is not before us. However, in connection with the remand pertaining to Count I, the circuit court will have the benefit of this Court's decision in *Assanah-Carroll v. Law Offices of Edward J. Maher, P.C.*, 480 Md. 394 (filed July 28, 2022), in which we address this issue.

## IV

## Conclusion

For the reasons set forth herein, we conclude that:

1. Section 5-4(a)(2) of Article 13 of the Baltimore City Code does not provide a private right of action to recover rent and related payments that a tenant made during a period in which the landlord was unlicensed. Accordingly, the circuit court did not err in dismissing Count II of the complaint.

2. To the extent that the Aletis seek restitution of rent and related fees paid under the lease during the period in which Metropolitan was unlicensed, the Aletis did not state a claim for money had and received. To that extent, we affirm in part the circuit court's dismissal of Count III of the complaint.

3. The circuit court erred in dismissing the claim for money had and received to the extent that the Aletis seek restitution of legal fees that they paid related to actions Metropolitan had no legal right to bring. To that extent, we reverse that part of the circuit court's dismissal of Count III of the complaint.

4. The Aletis did not state a claim for breach of contract to recover payments that they made to Metropolitan under the lease. Accordingly, the circuit court properly dismissed Count IV of the complaint.

5. The Court of Special Appeals' consideration of Count I is not before us. Accordingly, that count is remanded to the circuit court in accordance with that court's opinion. In considering the declaratory judgment count, the circuit court will have the benefit of holdings in *Assanah-Carroll*, which are germane to that count.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 75% BY THE PETITIONERS AND 25% BY THE RESPONDENTS.**

Circuit Court for Baltimore City
Case No. 24-C-20-001105
Argued: February 7, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 39

September Term, 2021
_____

KARUNAKER ALETI, ET UX.

v.

METROPOLITAN BALTIMORE, LLC, AND
GABLES RESIDENTIAL SERVICES, INC.
_____

> \*Getty, C.J.
> \*McDonald
> Watts
> Hotten
> Booth
> Biran
> Wilner, Alan M. (Senior Judge,
> Specially Assigned),
>
> JJ.

_____

Concurring and Dissenting Opinion by Watts,
J., which Wilner, J., joins.

_____

Filed: July 28, 2022

\*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, they also participated in the decision and adoption of this opinion.

Respectfully, I concur and dissent. I would hold that Baltimore City Code ("BCC"), Art. 13, § 5-4(a)(2), under which an unlicensed landlord may not charge, accept, retain, or seek to collect rent, provides for an implied private right of action under which tenants may recover unlawfully charged rent. In my view, all three factors required to be considered under the test set forth by the United States Supreme Court in Cort v. Ash, 422 U.S. 66, 78 (1975) for determining whether a statute contains an implied private right of action are satisfied. As such, I would hold that BCC, Art. 13, § 5-4(a)(2) sets forth an implied private right of action in which a tenant of an unlicensed landlord can recover rent and other compensation paid when the landlord unlawfully collected rent while unlicensed. In addition, based on the circumstances of the case, I would conclude that Karunaker Aleti and Chandana Aleti (together, "the Aletis"), Petitioners, sufficiently pled against Metropolitan Baltimore, LLC and Gables Residential Services, Inc. (together, "Metropolitan"), Respondents, claims for breach of contract and monies had and received.[1]

## Implied Right of Private Action

In Cort, the Supreme Court set forth a test for determining whether a statute provides an implied private right of action. The three relevant factors of the test[2] are:

First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a [] right in favor of the plaintiff?

---

[1]I concur with the conclusion that the circuit court erred in dismissing the claim for money had and received insofar as the Aletis sought restitution of legal fees paid where the Aletis alleged that Metropolitan brought an unlawful action for nonpayment of rent charged while unlicensed and Metropolitan collected and retained legal fees. See Maj. Op. at 44.

[2]The fourth prong of the test, which does not apply to State courts, is as follows: "[I]s the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" Cort, 422 U.S. at 78 (citations omitted).

Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

Cort, 422 U.S. at 78 (cleaned up). This Court has consistently applied the Cort factors in making a determination as to whether a statute sets forth a private right of action. See, e.g., Erie Ins. Co. v. Chops, 322 Md. 79, 585 A.2d 232 (1991); Baker v. Montgomery Cty., 427 Md. 691, 50 A.3d 1112 (2012); Fangman v. Genuine Title, LLC, 447 Md. 681, 136 A.3d 772 (2016).

In this case, the statutory provision at issue is BCC, Art. 13, § 5-4(a). BCC, Art. 13,§ 5-4(a) requires that landlords be licensed and specifically prohibits an unlicensed landlord from charging rent, stating:

> Except as provided in subsection (b)[3] of this section, no person may:
>
> (1) rent or offer to rent to another all or any part of any rental dwelling without a currently effective license to do so from the Housing Commissioner; or
>
> (2) charge, accept, retain, or seek to collect any rental payment or other compensation for providing to another the occupancy of all or any part of any rental dwelling unless the person was licensed under this subtitle at both the time of offering to provide and the time of providing this occupancy.

Addressing the first factor of the Cort test, the plain language of the statute indicates that tenants form a class for whose special benefit BCC, Art. 13, § 5-4(a)(2) was enacted— specifically, tenants who paid rent and other compensation to unlicensed landlords. In

_____

[3]Subsection (b) provides: "A license is not required under this subtitle for any rental dwelling that is owned and operated by the Housing Authority of Baltimore City."

other words, the express language of the statute indicates that tenants of unlicensed landlords are members of a "class for whose especial benefit the statute was enacted—that is, [] the statute create[s] a right in favor of" tenants of unlicensed landlords. Cort, 422 U.S. at 78 (cleaned up). Although the general public may benefit from the statute as it would with any statute, the general public is not for whose special benefit BCC, Art. 13, § 5-4(a)(2) was enacted. BCC, Art. 13, § 5-4(a)(2) unequivocally states that an unlicensed landlord may not "charge, accept, retain, or seek to collect any rental payment or other compensation for providing to another the occupancy of all or any part of any rental dwelling[.]" This explicit prohibition clearly operates to the special benefit of tenants of unlicensed landlords.

Where an unlicensed landlord obtains a license and makes any repairs necessary for a rental dwelling to pass an inspection—a prerequisite for obtaining a license, see BCC, Art. 13, § 5-6(3)—the landlord's actions directly benefit only the tenants of the rental dwelling, who get to enjoy the right under BCC, Art. 13, § 5-4(a)(2) to live in a home that has been made habitable by the landlord and found to be habitable under the BCC. Where an unlicensed landlord leases a rental dwelling without obtaining a license, the landlord is expressly forbidden from collecting rent under BCC, Art. 13, § 5-4(a)(2). Under such a circumstance, that prohibition directly benefits only the tenants of the rental dwelling, who have the right under BCC, Art. 13, § 5-4(a)(2) not to pay rent or other compensation while living in a rental property that has been offered for rent by an unlicensed landlord and that has not been found to be habitable—and that may, in fact, be uninhabitable.

An analysis of the language of BCC, Art. 13, § 5-4(a)(2) and related ordinances

- 3 -

under the first Cort factor—that the plaintiff is a member of a class for whose special benefit the legislature enacted the statute—yields a particularly compelling result. The plain language of BCC, Art. 13, § 5-4(a)(2) and related ordinances makes clear that the purpose of the provision is to benefit tenants by increasing the habitability of rental dwellings in Baltimore City. Under BCC, Art. 13, §§ 5-6(3), a rental dwelling must pass an inspection in order for a landlord to obtain a license. Under BCC, Art. 13, § 5-7(b)(4)(i)(B), an inspector must determine whether a rental dwelling meets the health and safety standards set forth by the BCC. And, significantly, under BCC, Art. 13, § 5-8, there is no fee for a license. These ordinances demonstrate that the purpose of BCC, Art. 13, § 5-4(a)(2)'s prohibition on an unlicensed landlord charging rent is to increase the number of habitable rental dwellings available to tenants, rather than to specifically benefit the general public.[4] Although the general public may receive some benefit from BCC, Art. 13, § 5-4(a)(2), the statute and related ordinances demonstrate that the statute was enacted for the primary benefit of tenants.

This is confirmed by the legislative history of the statute, which reveals that, in letters to the Baltimore City Council written when it was considering the bill through which it would enact BCC, Art. 13, § 5-4(a)(2), the Maryland Multi-Housing Association and the Baltimore Development Corporation expressed the expectation that the bill would reduce the number of rental dwellings that were substandard or not properly maintained. Although

---

[4]In reasoning that the first Cort factor is not satisfied, the Majority focuses on the goals of Article 13 of the BCC as a whole. See Maj. Op. at 24-26. The proper inquiry, though, is whether tenants are members of a class for whose special benefit the Baltimore City Council specifically enacted BCC, Art. 13, § 5-4(a)(2).

- 4 -

such an outcome may incidentally provide some benefit to the general public, tenants are the only group or class of people who directly benefit from the statute by gaining the ability to live in rental properties that have been made habitable and by not being required to pay rent unless the landlord has a license assuring such habitability.

As to the second factor of the Cort test, whether there is an indication of legislative intent, explicit or implicit, "either to create or deny" a private right of action under BCC, Art. 13, § 5-4(a)(2), this factor is also satisfied because the plain language of BCC, Art. 13, § 5-4(a)(2) and its legislative history indicate that the Baltimore City Council intended to create a private right of action. Cort, 422 U.S. at 78 (citation omitted). First, as explained above, through the plain language of BCC, Art. 13, § 5-4(a)(2), the Baltimore City Council has, in no uncertain terms, forbidden unlicensed landlords from charging, accepting, retaining, or seeking to collect rent or other compensation. This unequivocal prohibition in and of itself goes a long way toward showing that the Baltimore City Council intended for tenants of unlicensed landlords to have a right under BCC, Art. 13, § 5-4(a)(2) to recover rent and other compensation paid when landlords were unlicensed.

In addition, the plain language of BCC, Art. 13, § 5-25, which concerns enforcement of Subtitle 5 by environmental citation, contains language indicating that the Baltimore City Council intended for BCC, Art. 13, § 5-4(a)(2) to set forth an implied private right of action. BCC, Art. 13, § 5-25(a), titled "In general," states that, "[i]n addition to any other civil or criminal remedy or enforcement procedure, this subtitle may be enforced by issuance of an environmental citation[.]" In turn, BCC, Art. 13, § 5-25(b) states that "[t]he issuance of an environmental citation to enforce this subtitle does not preclude pursuing

any other civil or criminal remedy or enforcement action authorized by law."

The reference to a civil remedy in BCC, Art. 13, § 5-25(a) is significant because, although Subtitle 5 of Article 13 of the BCC sets forth a public enforcement process that may be imposed upon landlords, BCC, Art. 13, § 5-25(a) makes clear that the Subtitle may be enforced through a civil or criminal remedy or an enforcement procedure. By stating that "[i]n addition to any other civil or criminal remedy or enforcement procedure," Subtitle 5 may be enforced by issuance of an environmental citation, BCC, Art. 13, § 5-25(a) shows that civil remedies exist for a violation of the Subtitle. In fact, BCC, Art. 13, § 5-25(b) confirms what is set forth in BCC, Art. 13, § 5-25(a)—that the issuance of an environmental citation would not preclude any other civil or criminal remedy or enforcement action authorized by law. This demonstrates that the Baltimore City Council intended civil remedies to be available for a violation of the Subtitle.

By way of illustration, BCC, Art. 13, § 5-2 states that the Housing Commissioner must adopt rules and regulations to carry out Subtitle 5, and BCC, Art. 13, § 5-17 states that the Housing Commissioner may require a rental dwelling to be vacated. In addition, BCC, Art. 13, § 5-26(a) states:

> Any person who violates any provision of this subtitle (including any offense listed in § 5-15 of this subtitle as potential cause for a denial, suspension, or revocation of a license) or any provision of a rule, regulation, or order adopted or issued under this subtitle is guilty of a misdemeanor and, on conviction, is subject to a fine of not more than $1,000 for each offense.

The provisions above pertain to enforcement actions or procedures and criminal remedies, not civil remedies. Given that BCC, Art. 13, § 5-25 refers to both a civil or criminal remedy and enforcement actions or procedures, a civil remedy must be something different than an

"enforcement action" or "enforcement procedure" and is obviously different than a criminal remedy. A statute must be read "as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." Moore v. RealPage Util. Mgmt., Inc., 476 Md. 501, 264 A.3d 700, 706 (2021) (citation omitted). The only logical, rational, or reasonable interpretation of the references to civil remedies in BCC, Art. 13, § 5-25 is that the Baltimore City Council intended for Subtitle 5 to provide civil remedies for tenants. And, the plain language of BCC, Art. 13, § 5-4(a)(2) indicates that the Baltimore City Council intended it to set forth a private right of action in which a tenant of an unlicensed landlord as a civil remedy can recover rent and other compensation paid when the landlord was unlicensed.

The legislative history of BCC, Art. 13, § 5-4(a)(2) indicates that the Baltimore City Council intended to create a private right of action. The Baltimore City Council did not enact BCC, Art. 13, §§ 5-4(a)(2) and 5-25 simultaneously. Instead, the language of BCC, Art. 13, § 5-25 predates that of BCC, Art. 13, § 5-4(a)(2). The Baltimore City Council enacted an earlier version of BCC, Art. 13, § 5-25 in 2007, when BCC, Art. 13, § 5-4 simply stated that "[n]o person may operate any multiple-family dwelling or rooming house without a license to do so from the Commissioner." Balt. City Council, Council Bill 18-0185 at 20, 9. In 2018, the Baltimore City Council enacted BCC, Art. 13, § 5-4(a)(2) and relocated the predecessor of BCC, Art. 13, § 5-25 to where it is today without change. See id.

When the Baltimore City Council enacted BCC, Art. 13, § 5-4(a)(2) (under which an unlicensed landlord cannot collect rent or other compensation), the Baltimore City

Council could have amended what is now BCC, Art. 13, § 5-25 (by, for instance, deleting the references to civil remedies) but it did not do so. The Baltimore City Council's leaving what is now BCC, Art. 13, § 5-25 unchanged indicates that the Baltimore City Council intended for the references to civil remedies in the statute to coexist with the prohibition on an unlicensed landlord collecting rent or other compensation in BCC, Art. 13, § 5-4(a)(2). The simultaneous existence of BCC, Art. 13, §§ 5-4(a)(2) and 5-25 indicates that the Baltimore City Council intended for there to be civil remedies—*i.e.*, a private right of action—for a tenant of an unlicensed landlord who illegally collects rent. That, along with the circumstance that BCC, Art. 13, § 5-4(a)(2) unequivocally provides that an unlicensed landlord cannot collect or keep rent, shows that the Baltimore City Council intended for tenants to have a right to recover rent illegally charged by unlicensed landlords.

With respect to the third Cort factor, whether it would be "consistent with the underlying purposes of the legislative scheme to imply" a private right of action under BCC, Art. 13, § 5-4(a)(2) for tenants of unlicensed landlords, this factor is satisfied because it would be in keeping with—and, indeed, would advance—the purpose of the statutory scheme to recognize an implied private right of action under BCC, Art. 13, § 5-4(a)(2). See Cort, 422 U.S. at 78 (citations omitted). The plain language and legislative history of both BCC, Art. 13, § 5-4(a)(2) specifically and Subtitle 5 of Article 13 of the BCC generally demonstrate that the purpose of the statutory scheme is to benefit tenants of unlicensed landlords by incentivizing such landlords to get licenses and, in the process, make any repairs necessary for properties to pass inspections and be in habitable condition at the time of rental. This is made clear by BCC, Art. 13, §§ 5-4(a)(2) (under which an

unlicensed landlord cannot collect rent or other compensation), 5-6(3) (which sets forth the rental license prerequisite of passing an inspection), and 5-7(b)(4)(i)(B) (which requires an inspector to determine whether a rental dwelling meets Baltimore City's health and safety standards). Significantly, BCC, Art. 13, § 5-8 states that "[n]o fee is imposed for a rental dwelling license issued under this subtitle[,]" which demonstrates that the purpose of the licensing requirement is to improve the state of rental dwellings, not to generate revenue for Baltimore City.

As discussed above, when the Baltimore City Council was considering the bill through which it would enact BCC, Art. 13, § 5-4(a)(2), stakeholders—including the Maryland Multi-Housing Association and the Baltimore Development Corporation— expressed the expectation that the licensing requirement would reduce the number of rental dwellings that were not up to code. This confirms that the purpose of BCC, Art. 13, § 5-4(a)(2) is to encourage unlicensed landlords to make the repairs necessary to get licensed. The existence of an implied private of action under BCC, Art. 13, § 5-4(a)(2) would not only be consistent with the statute, but also would further its purpose of encouraging unlicensed landlords to get licenses. By creating a private right of action in which a tenant of an unlicensed landlord can recover rent and other compensation paid when the landlord was unlicensed, the Baltimore City Council created an additional incentive for unlicensed landlords to get licensed and maintain rental properties in habitable conditions for tenants. Otherwise, under BCC, Art. 13, § 5-4(a)(2), unlicensed landlords may be forced to return

rent illegally collected in the statute.[5]

The clear purpose of BCC, Art. 13, § 5-4(a)(2) is to benefit tenants by motivating unlicensed landlords to obtain licenses and make repairs necessary for rental dwellings to pass inspections. The goal of BCC, Art. 13, § 5-4(a)(2) is not to provide a remedy for the general public or for tenants only in the event that they have been harmed as a result of living in uninhabitable rental dwellings. Rather, BCC, Art. 13, § 5-4(a)(2) is a prophylactic law intended to prevent such harm in the first place. Without an implied private right of action under BCC, Art. 13, § 5-4(a)(2), landlords will have less incentive to repair rental dwellings and obtain a license, and tenants will be vulnerable to being harmed by living in uninhabitable rental dwellings, which BCC, Art. 13, § 5-4(a)(2) was intended to prevent. Recognizing an implied private right of action under BCC, Art. 13, § 5-4(a)(2) is essential to ensuring that the statute will be complied with.[6]

---

[5]With BCC, Art. 13, § 5-4(a)(2), not only did Baltimore City create an implied right of action for tenants to recover rent unlawfully charged by landlords, but also the City had the authority to do so under Article XI-A of the Maryland Constitution. This Court has concluded that unlike with a general law that encroaches on a statewide function or addresses a statewide problem, under Article XI-A of the Maryland Constitution, a local jurisdiction may establish a local law or a judicial cause of action pursuant to a local law concerning a matter of purely local concern. See, e.g., Edwards Systems Technology v. Corbin, 379 Md. 278, 841 A.2d 845 (2004). That is precisely what Baltimore City has done with BCC, Art. 13, § 5-4(a)(2) and the implied right of private action established by it.

[6]A question has arisen as to whether Baltimore City has the resources to enforce BCC, Art. 13, § 5-4(a)(2) to a meaningful degree. According to a letter by the Chief of the Bureau of the Budget and Management Research of Baltimore City, in Fiscal Year 2016, before the Baltimore City Council enacted the bill through which it enacted BCC, Art. 13, § 5-4(a)(2), Baltimore City was able to inspect only 62% of rental dwellings with at least three units. By passing the bill, the Baltimore City Council enacted BCC, Art. 13, § 5-7(b)(2)(i), under which a landlord must contract with a home inspector at the landlord's

From my perspective, this Court's role is to effectuate the intent of the Baltimore City Council, which unequivocally prohibited unlicensed landlords from collecting rent or other compensation. Where, as in this case, the test for determining the existence of an implied private right of action is satisfied, the Court must defer to the legislative body and recognize the right. For the above reasons, I would hold that BCC, Art. 13, § 5-4(a)(2) contains an implied a private right of action in which a tenant of an unlicensed landlord can recover rent and other compensation paid when the landlord was unlicensed.

**Breach of Contract**

In addition to an implied private right of action existing under BCC Art. 13, § 5-4(a)(2), the parties incorporated the requirement of compliance with the terms of Art. 13, § 5-4(a)(2) into the Apartment Lease Contract. Paragraph 44 of the lease provides that:

> In the event local laws or ordinances provide additional rights or remedies not included herein, this Apartment Lease Contract is amended by reference to such local laws and ordinances to incorporate the terms, rights, or remedies thereof herein. It is the intent of the parties to have this lease construed to include any such rights or remedies herein, and the provisions of such laws or ordinances shall supersede and control over the language of this Apartment Lease Contract to the extent they are in conflict.

In addition, Paragraph 44 of the lease states in pertinent part: "It is the intent of the parties to comply with the laws of Maryland, including local county and municipal ordinances." By its plain terms, Paragraph 44 of the lease incorporated all applicable local laws,

---

expense to conduct the inspection necessary to obtain a license. Given that Baltimore City was unable to fully inspect rental dwellings with at least three units and decided to make landlords financially responsible for inspections, there may be a question as to whether the City has the resources to sufficiently enforce BCC, Art. 13, § 5-4(a)(2) to a degree that would effectuate its purpose of reducing the instance of uninhabitable rental dwellings.

including BCC, Art. 13, § 5-4(a)(2).  Under both the terms of the lease and BCC, Art. 13, § 5-4(a)(2), no rent was due if Metropolitan lacked a license.[7]  The lease, therefore, provides a basis for the instant breach of contract claim, regardless of whether BCC Art. 13, § 5-4(a)(2) creates a private action or not (which, in my view, it does).

## Money Had and Received

The Aletis' claim for money had and received should not be barred on the ground that they were parties to a contract that was fully performed.  In Bourgeois v. Live Nation Ent., Inc., 430 Md. 14, 51, 59 A.3d 509, 530-31 (2013), this Court held that Maryland continues to recognize claims for money had and received, that a plaintiff can utilize such a claim to recover money paid in excess of what is allowed by a statute (such as one within the BCC) unless the statute precludes such recovery or the contract pursuant to which the money was paid has been fully consummated, and that a plaintiff cannot utilize a claim for money had and received to recover money paid under a fully consummated, non-usurious contract as to which the parties are *in pari delicto*.[8]

---

[7]Metropolitan's counsel's contention at oral argument that Paragraph 44 simply means that Metropolitan could terminate the lease whenever it recognized that it lacked a license is unpersuasive.  Paragraph 44 represented a commitment by Metropolitan to comply with BCC, Art. 13, § 5-4(a)(2) by refraining from illegally charging rent without a license.  Nothing in Paragraph 44 gave Metropolitan the right to disavow its obligation to comply with BCC, Art. 13, § 5-4(a)(2) or force the Aletis out of their home on the ground that Metropolitan lacked a license.  Similarly, the breach of contract claim is not dependent on whether BCC, Art. 13, § 5-4(a)(2) creates an implied right of private action.

[8]Under the *in pari delicto* (Latin for "in equal fault") doctrine, "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *In Pari Delicto*, Black's Law Dictionary (11th ed. 2019); *In Pari Delicto Doctrine*, Black's Law Dictionary (11th ed. 2019).  In Bourgeois, 430 Md. at 48, 59 A.3d at 529, this Court observed that, through a claim for money had and received, a plaintiff can recover "money

In this case, by entering into the lease, which incorporated BCC, Art. 13, § 5-4(a)(2), Metropolitan agreed not to illegally charge rent without a license. Metropolitan violated the lease agreement by doing just that—charging the Aletis rent without a license. Given that Metropolitan failed to comply with the terms of the contract, the contract between the parties was not fully performed. Even though Metropolitan lacked a license when the parties entered into the lease, the Aletis had no control over whether or when Metropolitan would honor its obligation under the contract to secure a license, *i.e.*, the Aletis had no control over whether Metropolitan would perform its obligation under the contract. In addition to the contract not being fully performed because Metropolitan failed to comply with its terms, by collecting rent illegally from the Aletis, Metropolitan "obtained possession of money which, in equity and good conscience, [it] ought not to be allowed to retain." Bourgeois, 430 Md. at 46, 59 A.3d at 528 (cleaned up). The claim for money had and received should not be barred on the ground that the contract was fully performed where it is clear that Metropolitan obtained money that it was prohibited by law from collecting.

**Damages**

As to all three claims (violation of BCC, Art. 13, § 5-4(a)(2), breach of contract, and money had and received), I would conclude that the damages are the rent payments that Metropolitan unlawfully required the Aletis to pay when it lacked a license. Contrary

---

paid under mistake of fact or law, . . . obtained by fraud or false pretenses, paid upon an unexecuted illegal contract, or, in certain circumstances, paid under an executed illegal contract." (Citation omitted).

- 13 -

to Metropolitan's contention, it would not be a windfall for the Aletis to recover rent that Metropolitan illegally charged without being required to show that they were injured as a result of any disrepair or defects in the rental dwelling. BCC, Art. 13, § 5-4(a)(2) does not contain an exception permitting a landlord to collect rent if a tenant cannot demonstrate having lived in an uninhabitable property as result of a landlord being unlicensed. In other words, the ordinance does not state that an unlicensed landlord is precluded from collecting rent only where a tenant raises an issue as to the condition of the rental dwelling. Instead, BCC, Art. 13, § 5-4(a)(2) is a law whose purpose is to prevent a tenant from having to live in conditions that do not comply with the BCC in the first place. In an action for a violation of BCC, Art. 13, § 5-4(a)(2), the harm or injury to the tenant is that the landlord charged and collected rent from the tenant unlawfully in violation of the statute.

Metropolitan's reliance on CitaraManis v. Hallowell, 328 Md. 142, 613 A.2d 964 (1992) for the contention that the Aletis failed to state a cause of action because they have not established damages is unpersuasive. In CitaraManis, id. at 157-58, 613 A.2d at 971, we held that, to prevail under the Maryland Consumer Protection Act, a tenant must show actual loss or injury independent of a failure by a landlord to comply with a licensing requirement. Significantly, in CitaraManis, the ordinance at issue stated that "[n]o building or structure, or part thereof, shall be leased, rented or let or subleased, subrented or sublet without first obtaining a rental housing license from the department of public works and paying the requisite fee or charge therefor." CitaraManis, 328 Md. at 145 n.1, 613 A.2d at 965 n.1. This language is substantively identical to BCC, Art. 13, § 5-4(a)(1), which provides that "no person may[] rent or offer to rent to another all or any part of any rental

- 14 -

dwelling without a currently effective license to do so from the Housing Commissioner[.]" (Paragraph break omitted). By contrast, in addition to the prohibition expressed in BCC, Art. 13, § 5-4(a)(1), under BCC, Art. 13, § 5-4(a)(2), the charging, accepting, retaining, or seeking to collect any rental payment or other compensation is explicitly prohibited unless the landlord is licensed under Subtitle 5 of Article 13 of the BCC. Given that specific prohibition under BCC, Art. 13, § 5-4(a)(2), the actual injury is the tenant being required to pay rent illegally, and the measure of damages is the amount of rent illegally collected.[9]

For the above reasons, respectfully, I concur and dissent.

Judge Wilner has authorized me to state that he joins in this opinion.

---

[9]I disagree with the reasoning that recognizing an implied private right of action under BCC, Art. 13, § 5-4(a)(2) would be inconsistent with tenants' remedies under Maryland Consumer Protection Act and the common law action for restitution, as we have interpreted them in CitaraManis and related cases. See Maj. Op. at 16, 31-34. There would be no such inconsistency. Far from creating an inconsistency, such a private right of action would simply supplement the Aletis' rights and remedies under State law.